IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| **BOBBY DALE WATSON,** ) | |
| ) | |
| **Plaintiff** ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 4:11-CV-02187-KOB |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of the Social** ) | |
| **Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On August 24, 2006, the claimant, Bobby Dale Watson, applied for supplemental security income under Title XVI of the Social Security Act. (R. 18). The claimant alleges disability commencing on January 1, 2000 because of mild mental retardation/borderline intellectual functioning. (R.20). The onset date of disability was amended from January 1, 2000 to August 24, 2006 during the hearing. (R.18). The Commissioner denied the claim on April 30, 2009 (R.18). On June 11, 2007, the claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on May 14, 2009 in Gadsden, Alabama. (R. 18). In a decision dated August 14, 2009, the ALJ found that the claimant was not disabled as defined by the Social Security Act. (R. 26). On April 22, 2011, the Appeals Council found no reason to review the ALJ's decision. (R. 1). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the

1

reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUE PRESENTED

The claimant presents the following issue for review: whether substantial evidence supports the ALJ's determination that the claimant did not have an impairment or combination of impairments that met or medically equaled listing 12.05(C).

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ but must view the record in its entirety and take account of the evidence that detracts from the evidence relied on by the ALJ.

*Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV.  LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432 (d)(1)(A) (2004).  To make this determination, the Commissioner employs a five-step, sequential evaluation process:

>    (1) Is the person presently unemployed;
>    (2) Is the person's impairment severe;
>    (3) Does the person's impairment meet or equal one of the specific impairments
>    set forth in 20 C.F.R. pt. 404, subpt. P, app.1;
>    (4) Is the person unable to perform his or her former occupation;
>    (5) Is the person unable to perform any other work within the economy?
>
>    An affirmative answer to any of the above questions leads either to the next
>    question, or, on steps three and five, to finding a disability. A negative answer to
>    any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

To establish a disability under section 12.05(C), a claimant must establish "a valid verbal, performance, or full scale IQ score of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." *Davis v. Shalala*, 985 F.2d 528, 530 (11th Cir. 1993). Furthermore, in evaluating mental impairments under 12.05(D), the ALJ must use the "special technique" that requires separate evaluations on a four-point scale of how the claimant's mental impairment impacts 1) daily living activities; 2) social functioning; 3) concentration, persistence, or pace; 4) episodes of decompensation. *Moore v. Barnhart*, 405

F.3d 1208, 1213 (11th Cir. 2005); *see also* 20 C.F.R. § 404.1520a(c)(3-4).

## V. FACTS

The claimant completed the eighth grade and was thirty-four years old at the time of the hearing. (R. 66, 68). He has no past relevant work experience. (R. 25). The claimant alleges he is unable to work because of mild mental retardation/borderline intellectual functioning. (R. 20).

*Physical Limitations*

The claimant submitted his report card from high school. In high school, he made largely B's and C's in special education classes. He dropped out of school in the ninth grade. (R. 154).

On February 23, 2004, Dr. David Wilson, a licensed psychologist at Gadsden Psychological Services, L.L.C., examined the claimant and prepared a report. According to Wilson's report, the claimant denied having any serious medical problems and said he did not take any medications. However, the claimant said "when [he] was growing up, [he] did a bunch of gas—it liked to kilt [him]."[1] In addition, on the WAIS III, the claimant obtained a Verbal IQ of 65 and a Performance IQ of 79, which yielded a Full Scale IQ of 69. Dr. Wilson determined in his report that (1) the claimant's thought processes were "grossly intact"; (2) his speech was clear and normal, although he did have obvious language limitations; (3) his insight and judgment appeared poor; (4) he had an above average attention to detail and fairly good sequential thinking; (5) he had severe academic deficits and was functionally illiterate; and (6) he was mildly mentally retarded. (R. 210-13). Furthermore, Dr. Wilson found the claimant capable of working as long as he was not required to read, write, or spell. (R. 210-13).

---

[1]The record is unclear as to what drug "gas" is. However, the claimant did not use this drug during the relevant period of disability, and no evidence exists to show that the claimant's substance abuse caused his disability.

The report also reflects that the claimant provided to Dr. Wilson the following information: (1) he smokes two packs of cigarettes a day that he finances by picking up aluminum cans; (2) he began doing drugs when he was seventeen or eighteen and used "gas" every day for four years; (3) after a near death experience, he stopped using "gas" and does not plan on using it in the future; (4) the police charged him with assault and battery in 1993 for "beating up on [his] wife"; (5) he has not consumed alcohol since this arrest; (6) he has not suffered from a serious head injury, seizures, or received any type of mental health treatment; (7) employers fired him from several of his previous jobs for "laying out to[o] much"; (8) he has not been on disability; and (9) he denied being depressed or having suicidal thoughts. Further, he commented, "[he] can do farming– like cows and horses and pigs but [he] do[es]n't want to work back in no chicken plant." (R. 210-13).

On an undated Disability Report, the claimant stated that the conditions that limited his ability to work were his learning disability, injured/disfigured hands, and back pain. He complained that his back hurts when he bends over and "picks things up;" his hands hurt when the weather is cold; his lower back hurts even when he sits down; and he has problems learning new tasks and retaining information. He alleges that he has been unable to work since January 1, 2000. Further, he quit his most recent job at McDonald's on May 30, 2005 because he "did not feel they were paying [him] right," and no other business hired him. On this report, the claimant stated that he has not seen a doctor or hospital regarding these conditions and takes no medications.(R. 109-114).

On a Work History Report dated February 27, 2007, the claimant reported that he has worked at Bojangles as a chicken breader; at Goldkist as a chicken catcher; at Tyson as a chicken

hanger; at D&F Equipment as a sand blaster; at Plastic Craft; and at McDonald's as a cook. (R. 115-22).

In a Daily Activities Questionnaire dated February 27, 2007, the claimant reported that his illness has not caused any changes in his sleeping habits. In addition, he indicated that he can care for his personal needs. The claimant stated that his mother cooks his meals and assists him with shopping, whereas he can wash his own dishes and clean his kitchen floor. He reported that he often watches television all day if no one stops him from doing so. He indicated that he leaves his house every day, normally going out by walking or riding with someone else. He is able to bathe, feed, and hold his child. The claimant reported that he can follow instructions but has difficulty completing complex tasks if no one forces him to finish them. (R. 124-27).

In a Physical Activities Questionnaire dated February 27, 2007, the claimant reported that each day, he stays at home, watches the baby, and does housework and yardwork. He stated he does not have difficulties completing routine or familiar tasks, standing, walking, or sitting. He reported he has four children and helps the eldest three get ready for school each day. In addition, he indicated he is responsible for changing the baby's diapers and giving him a bath each day. He noted that his condition limits him from cooking and preparing meals and shopping because he does not know how to cook full meals and because he cannot distinguish what he needs to get from what he wants to get.  However, he reported that his condition does not limit him from performing household chores, yard work, loading and unloading groceries, or driving a car. He stated that he can normally only perform activities for thirty minutes to one hour before taking a break because no one is there to "keep on [him] to keep at it." He does not take any medications for his condition. (R.130-35).

On March 27, 2007, Dr. Mary Arnold, a licensed psychologist, and Lefrante Williams, a disability specialist, examined the claimant on behalf of the DDS. The claimant stated that he was unable to sustain employment because he "couldn't write the date or type words." He reported no use of medication or mental health services. Furthermore, he indicated that he was a special education student through tenth grade and "played hooky half the time." He noted he has poor reading and writing skills and has never had a driver's license. The claimant reported that two years ago he attempted suicide by "drinking gasoline" because he was "down and out" because of family problems. He stated that he quit drinking alcohol "after [his] kids were born" though he still smokes two packs of cigarettes each day. Dr. Arnold reported that the claimant is "alert and oriented in all spheres." He indicated that the claimant can mentally add and subtract simple digits; can name the months of the year forward in sequence but jumbles the sequence back; can name the governor of Alabama but cannot identify Lincoln or Martin Luther King, Jr. (R. 167-68).

Furthermore, Dr. Arnold reported that the claimant's speech is fluid, and he reaches goal ideas without tangential or circumstantial thinking. Dr. Arnold noted that the claimant demonstrated sound judgment, stating that if lost in the woods, he would "look for a trail" and if in an emergency, he would call "911." In an IQ test, Dr. Arnold reported that the claimant put forth a good effort, though he tended to dawdle. He scored an full-scale IQ of 72 in the borderline range and a verbal IQ of 75. Dr. Arnold stated that he understands instructions and shifts tasks without apparent difficulty. (R. 168-69).

In a DDS Medical Examiner's Report completed on March 28, 2007, Dr. Alvin Tenchavez found the claimant had no notable health issues other than his back pain. He sustained

severe burns on both hands at the age of three and underwent bilateral hand surgery for the burns, though this did not affect his overall functionality. (R. 172-74).

Dr. Eugene Fleece completed a Mental RFC Assessment of the claimant on April 17, 2007. He found that the claimant's ability to understand, remember, and carry out detailed instructions was moderately limited. In addition, he indicated the claimant was moderately limited in maintaining attention and concentration for extended periods and in sustaining an ordinary routine without special supervision. Furthermore, he noted that the claimant was moderately limited in the following abilities: to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to changes in the work setting; to set realistic goals; and to make plans independently of others. Dr. Fleece found the claimant would likely need special supervision when learning new, simple tasks. However, Dr. Fleece noted that after completing routine training, the claimant could function adequately with no extra oversight. According to Dr. Fleece, the claimant can concentrate on simple tasks for two hours at a time given all customary breaks. In addition, Dr. Fleece recommended that the claimant's interaction with the public should be casual; feedback should be supportive and non-confrontational; changes in work settings should be gradual and infrequent; and the claimant could benefit from help in long-term planning. (R. 197-99).

In a psychiatric review on April 17, 2007, Dr. Eugene Fleece, examining on behalf of the SSA, found that the claimant's history of special education presented a medically determinable impairment that did not precisely satisfy the general diagnostic criteria on the form. However, Dr. Fleece noted that no school assessment was available for the claimant, just transcripts that

indicate that the claimant attended special education classes. Dr. Fleece rated the claimant's functional limitations as a moderate restriction of activities of daily living; a mild difficulty in maintaining social functioning; and a moderate difficulty in maintaining concentration, persistence, and pace. (R. 175-87).

In an undated Daily Activities Questionnaire completed by the claimant's brother, the brother wrote that on a typical day, the claimant takes his children to school then tries to do odd jobs to get enough money for cigarettes and gas. He noted that the claimant's mother and brother often have to pick up the children from school because the claimant will forget to pick them up. He indicated that the claimant will often buy things at stores impulsively; often gets behind in paying his bills; and will not clean his house so his mother will have to clean it for him. He reported that the claimant has difficulty following directions and completing tasks such as not smoking in a non-smoking house or packing a suitcase properly. In addition, he noted that the claimant's brother's wife attempted to teach the claimant to read and reported that he was "too short of attention" and often complained about wanting to go smoke cigarettes or watch television instead of learning. Thus, she did not continue teaching him to read. (R. 137-40).

In a Disability Determination Transmittal from April 30, 2007, Eugene Fleece, Ph. D., a DDS physician, found that the claimant had organic mental disorders and obesity. (R. 81). The SSA turned down the claim, however, stating that the claimant's condition based on his learning disability, injured hands, and back problems was not severe enough to keep him from working. (R. 87).

On April 30, 2007, Gwendolyn Means, an SSA employee, made contact with the claimant to discuss several of his previous jobs. She wrote that the claimant's sandblasting job did not

9

involve any lifting or carrying. However, this job would not be considered past relevant work because the claimant's mental RFC was too low. In addition, she reported that as a chicken hanger, the claimant hung chickens on a line that went through the plant to be processed by other people. She wrote that the claimant could return to this job. (R.141-42).

Gwendolyn Means completed a Physical RFC Assessment for the claimant on April 30, 2007. Her primary diagnosis was morbid obesity, and her secondary diagnosis was a history of third degree burns of both hands. She found that he has no significant limitations of motion, although he should never climb a ladder, rope, or scaffolds and should avoid exposure to hazards like machinery and heights. Furthermore, she noted that Dr. Tenchavez, a treating physician in this case, supported her findings in the RFC Assessment. (R. 189-96).

*The ALJ Hearing*

The ALJ hearing took place on May 14, 2009. At the hearing, the claimant's attorney stated that for all practical purposes, the onset date of the disability should be the protective filing date. The claimant testified that he does not have a driver's license and has never had one. He testified that he drives occasionally, although he has not driven in the past two years. In addition, he testified that he was in jail in Ft. Payne once for old speeding tickets that he had not paid, which is why he quit driving. He indicated that he smokes an average of two packs of cigarettes each day but does not drink. (R.54-60).

The claimant testified that he dropped out of school in the middle of ninth grade. He noted that he has previously worked at Bojangles, McDonald's, Gold Kiss, Tyson's, and Kegel's. He reported he last worked at Tyson's. He hung chickens for roughly two weeks and stopped working there because they "ma[d]e him mad," and he "los[t] his temper." Before he worked at

Tyson's, he worked at Kegel's hanging chickens for roughly one month. He quit working at Kegel's after they fired him for not showing up to work. The claimant reported that he did not show up to work because he was "lazy." Before Kegel's, he worked at Gold Kiss hanging chickens for roughly three days. He stopped working at Gold Kiss because he did not like the management "breathing down [his] neck," and he "cussed them out" and lost his job. (R. 60-63).

The claimant reported that he has not been to the emergency room since Christmas. He testified that he takes prescription medicine to stay relaxed, although he does not know the name of the medication. The claimant alleged that he is unable to work because of his temper; he gets angry, starts fights, and then his employer fires him. Thus, he reported that he can never keep a job for very long. (R. 63-64).

The claimant testified that on February 16, 2009, he lost his temper when his ex-wife started a fight with his current wife. He claimed that he punched a table and broke his hand. He testified that after going to the hospital, the doctors put a cast on his broken hand; however, he did not keep the cast on for longer than three or four days because it hurt his hand too much. (R.64-65).

The claimant reported that he regularly sees a nurse practitioner in Raymondville who prescribed him the medication he takes for his nerves to calm him down. He testified that he forgot to tell his representative about this doctor, so she is not in the record. (R. 65-66).

The claimant testified that he has trouble keeping up with things and meeting deadlines and has his wife manage his affairs. He reported that he cannot read or write at all. He testified that because of this impairment, he could not read the order off of the cash register when he worked at McDonald's and lost his job. Furthermore, the claimant reported that he has trouble

handling money and doing basic calculations. However, he noted that he has no other psychological problems. (R.66-67).

Dr. Anderson, the medical expert, testified that the claimant has no documented physical problems or limitations. (R.68).

The claimant's wife testified that while she works, her stepmother and the claimant watch their children. However, she claimed that, most of the time, her stepmother watches the children because the claimant is "too tensed and stressed to tend to them." Furthermore, she testified that often little things will upset him, and he will lose his temper. In addition, she noted that he went to jail because he lost his temper with his ex-wife. She further testified that she believes he is unable to hold a job because of his temper and his inability to read or write. (R. 71-72).

The claimant testified that when he left prison, he went through vocational rehabilitation to teach him how to better keep a job but stopped going to meetings when he moved from Ft. Payne to Geraldine. The vocational expert testified that the state likely would not have an active file on the claimant because the record would be too old. (R. 73-74).

The vocational expert, Mr. Dan Kinard, testified that the claimant has no past relevant work based on an SSA-generated earnings query. According to this query, the claimant has had no work posted since 1994, and prior to 1994, he had more than forty-two employers. He earned less than $1,000 with each employer, and with many, he earned less than $200 or $100. He testified that the claimant is likely a discouraged worker, which is a person who has tried to work, had difficulty finding work, and has quit looking for work. Mr. Kinard reported that he could find nothing objective in the record that would prevent the claimant from working other than that the claimant's record resembled a person with either a chronic mental disability or a

person with poly-substance drug abuse. (R. 75-76).

Further, the vocational expert testified that the claimant's testimony that he could not count money was troubling because in his experience, even individuals he had encountered who were moderately retarded or markedly illiterate were usually able to count money. He recommended a neuropsychological evaluation for the claimant, which the ALJ then ordered the claimant to complete. (R. 76-77).

In addition, the vocational expert testified that an individual with the following limitations could perform work as a lumber stacker or dishwasher: non-complex job tasks that do not require production quotas; jobs with brief, frequent, and casual contact with the general public and coworkers; and job tasks that do not involve reading or writing. (R. 78-79).

The ALJ strongly encouraged the claimant to attend the neuropsychological examination the ALJ had ordered free of charge to better develop the claimant's record. However, the record does not indicate that the claimant attended the examination. (R. 79).

*The ALJ Decision*

In his decision, the ALJ found the claimant had not engaged in substantial gainful activity since August 24, 2006, the application date. He further found that the claimant has the following severe impairment: mild mental retardation/borderline intellectual functioning. In addition, he noted that although doctors had diagnosed the claimant with morbid obesity, the evidence in the record does not support any persistent limitations arising from the claimant's weight. Thus, the ALJ determined morbid obesity to be a non-severe impairment. In addition, the ALJ found that the claimant's "nervousness" does not constitute a medically determinable impairment because the claimant has never exhibited any persistent symptoms of this ailment. (R. 21).

The ALJ found that the claimant did not have an impairment or combination of impairments that met or medically equaled a listing. The ALJ examined listing 12.05 to determine if the claimant's level of mental retardation could qualify as a disorder. The ALJ found that paragraph A did not apply because the claimant was not dependent on others for his personal needs. To the contrary, the ALJ pointed to the record that showed the claimant cares for himself and his children. (R. 22).

In addition, the ALJ found that paragraph B did not apply because the claimant did not have a valid verbal, performance, or full scale IQ score of 59 or less. (R. 22).

Furthermore, the ALJ found that the claimant did not meet the requirements of paragraph C: a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing and additional and significant work-related limitation of function. He found that the claimant did not have impairments that cause persistent significant limitations aside from his somewhat-limited intellectual functioning. (R. 22).

Further, the ALJ noted that for the claimant to meet the requirements of paragraph D, he must have a valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. The ALJ found that the claimant has moderate restrictions in activities of daily living but can still perform and enjoy many activities of daily living. Further, the ALJ concluded that the claimant has mild to, at most, moderate difficulties in social functioning. In addition, he incorporated the findings of a PRTF examination and established that the claimant has moderate difficulties regarding concentration,

persistence, and pace, although he is capable of "persisting when necessary." The ALJ found that the claimant has not experienced any episodes of decompensation. (R. 22).

The ALJ noted that the claimant has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: non-complex job tasks that do not require production quotas; jobs with brief, frequent, and casual contact with the general public and coworkers; and job tasks that do not involve reading or writing. (R. 23).

The ALJ found that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the RFC assessment. He gave great weight to the opinions of Dr. Anderson and Dr. Arnold because they were consistent with the evidence of the record. He gave less weight to the opinion of Dr. Wilson, as his opinion was inconsistent with the claimant's admitted activities and tested abilities, although Dr. Wilson did note that the claimant appeared to be capable of working as long as he was not asked to read, write, or spell. (R. 23-24).

Furthermore, the ALJ found that the claimant has no past relevant work. Yet, he concluded that the claimant was able to perform work as a lumber stacker, dishwasher, or cleaner. Therefore, the ALJ stated that the claimant is capable of making a successful adjustment to work that exists in significant numbers in the national economy. (R. 25-26).

## VI. DISCUSSION

The claimant argues that when taken together, his mental and physical impairments meet the requirements of a listing under 12.05(C).

To establish a disability under section 12.05(C), a claimant must establish "a valid verbal,

performance, or full scale IQ score of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function." *Davis v. Shalala*, 985 F.2d 528, 530 (11th Cir. 1993).

Dr. Arnold's report found that the claimant did not meet the level of mental impairment required by section 12.05(C). However, Dr. Watson's report gives the claimant a Verbal IQ of 65 with a full scale IQ of 69, which meets the level of mental impairment required under section 12.05(C). The ALJ gave little weight to Dr. Watson's report, stating that it was inconsistent with the remainder of the record because it concluded that the claimant was functioning at a level of mild mental retardation as opposed to a level of borderline intellectual functioning.

Yet, even if the ALJ had given weight to Dr. Watson's report, this report still does not constitute *substantial* evidence that the claimant meets the standards of 12.05(C). The claimant has no documented physical or mental impairments that affect his ability to work. While these physical impairments do not have to be severe in themselves to qualify as physical impairments under section 12.05(C), they must be more than slight and must affect the claimant's ability to work. Here, the claimant presented no evidence that his hand impairment, back pain, or obesity affects his ability to work. In addition, although the claimant has taken medication for "nervousness," the record does not show that he has ever been diagnosed with anxiety or any other mental impairment. Thus, the ALJ determined that the claimant did not have an additional physical or mental impairment that was more than slight under 12.05(C). The court finds that substantial evidence supports this determination.

Furthermore, even assuming *arguendo* the claimant had raised an argument that he met listing 12.05(D), substantial evidence did not exist to prove the claimant's mental impairment

16

rendered him completely disabled pursuant to that standard. As the ALJ stated in his opinion, the claimant presented evidence suggesting mild to moderate difficulties in social functioning and concentration but no evidence establishing that these impairments were severe or rendered him unable to work.

Thus, based on the explicit findings of the ALJ, this court concludes that he properly applied the standard under listing 12.05(C) to determine whether a combination of impairments meets a listing and that substantial evidence supports his decision. Therefore, this court affirms the decision of the Commissioner.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 19th day of June, 2012.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE